IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

GREGORY ALLEN ANDERSON,

                Petitioner,

     v.                                       CASE NO. 17-3068-SAC

DAN SCHNURR, et al.,

                Respondents.

**MEMORANDUM AND ORDER**

This matter is a petition for habeas corpus filed pursuant to 28 U.S.C. § 2254. (ECF Doc. 1.) Petitioner, a prisoner in state custody at Hutchinson Correctional Facility in Hutchinson, Kansas, proceeds pro se. Petitioner challenges his conviction on the basis of a witness recantation. The Court has screened his Petition under Rule 4 of the Rules Governing Habeas Corpus Cases, foll. 28 U.S.C. § 2254, and dismisses this action for lack of statutory jurisdiction.

**Background**

On January 21, 2008, Petitioner was found guilty by a jury in the District Court of Johnson County, Kansas, of one count of rape and one count of solicitation to commit aggravated intimidation of a witness. *State v. Anderson*, No. 040-CR-1597. The decision was affirmed on direct appeal but remanded for resentencing. *State v. Anderson*, No. 100,527, 2010 WL 1610387 (Kan. App. 2010) (unpublished opinion), *rev. denied* 290 Kan. 1095 (Aug. 3, 2010). Petitioner was ultimately sentenced to a total 413-month term of imprisonment, followed by 36 months of post-release supervision. *State v. Anderson*, No. 040-CR-1597 (Oct. 12, 2010).

On April 4, 2011, Petitioner filed a motion seeking habeas relief in Kansas courts under K.S.A. 60-1507. The issue was whether he should receive a new trial based on newly discovered evidence of allegedly perjured testimony by Keith Proctor, whose testimony led to the solicitation charge. After a 2-day evidentiary hearing, the district court denied Petitioner's 60-1507 motion. *Anderson v. State*, No. 11-CV-6605 (Aug. 4, 2011). Petitioner appealed, and the Kansas Court of Appeals affirmed the district court's decision not to grant him a new trial based on Mr. Proctor's testimony. *Anderson v. State,* No. 03-1756, 2015 WL 5224713 at *1 (Kan. App. Aug. 28, 2015). On April 21, 2016, the Kansas Supreme Court denied Mr. Anderson's petition for review. *Anderson v. State*, No. 111,889 (Kan. April 21, 2016). On April 19, 2017, Petitioner filed the instant Petition, asking the Court for a new trial on the same grounds.

In its opinion affirming the district court's denial of Mr. Anderson's 60-1507 petition, the Kansas Court of Appeals summarized the factual background of the case as follows:

> In July 2004, the State filed a complaint charging Anderson with the rape of A.W., a woman who lived in his apartment complex. The parties are familiar with the underlying facts and we need not revisit those facts in any detail.
>
> On January 11, 2005, the State filed an amended complaint that added a charge of solicitation to commit murder or, in the alternative, aggravated intimidation of A.W. This amendment resulted from allegations made by Proctor, who was in jail with Anderson at the time on charges of aggravated assault, fraudulent obtaining of a prescription, and drug paraphernalia.
>
> Details of variations in Proctor's allegations during the proceedings leading up to Anderson's conviction and thereafter are key to arguments now before this court.
>
> *The preliminary hearing*
>
> At a preliminary hearing on the amended complaint conducted on September 1, 2005, Proctor testified that Anderson offered him $6000 to have A.W. " 'disappear by all means necessary' " so she could not testify against him. Proctor said he reported Anderson's proposition to both his attorney and the State not only because he wanted a plea deal but also because he "wanted to make sure that it didn't happen.... [He] grew up a mama's boy and [he had] lots of sisters and [he] didn't dig what was happening, what was being said." Proctor also produced a note written

2

on toilet paper that he said Anderson passed to him in jail, which supported his testimony. Further testing confirmed the writing on the toilet paper note matched Anderson's handwriting. Proctor acknowledged he had reached a plea deal shortly before the State filed the amended complaint against Anderson. That deal was contingent upon his truthful testimony, which Proctor insisted was "what [he was] doing [there]."

[*The trial*]

During Anderson's jury trial in late January 2008, Proctor—who by this time was in prison in part because he had not honored other parts of his plea deal—was not so forthcoming. The prosecutor predicted as much, explaining to the jury in opening statements that Proctor "is very apt to grab an attitude." During the trial, the district court allowed the prosecutor to question Proctor outside of the jury's presence first after the prosecutor announced he was "not really quite sure what [Proctor was] going to say when [they] put him on the witness stand or what his plan [was] in terms of his level of cooperation." During the proffer, Proctor repeatedly mentioned the extreme amount of stress, "turmoil," and "pressure" he had been subjected to by other inmates since he testified against Anderson. Proctor also testified that he had "a contract out on [him] because of giving information" and said he was "kind of persuaded to do [his] best to forget this matter." In that vain, Proctor generally recalled talking to Anderson while they resided in the same area of the jail and receiving a note from him, but he consistently testified that he could not "recall" or "remember the details" when asked about his specific allegations of Anderson's solicitation.

Once the jury was brought back in, Proctor once again testified that he could not recall or remember specific details of his interactions with Anderson, so the State was allowed to introduce his preliminary hearing testimony detailed above. Even when presented with his prior testimony, Proctor continued to say he could not recall specific details but insisted he "was not lying back then."

During deliberations, the jury had Proctor's testimony read back. The jury also inquired whether it could reach a decision on the solicitation charge without reaching a decision on the rape charge. After further deliberations, the jury returned a guilty verdict on both counts.

[*The 60-1507 evidentiary hearing*]

During the evidentiary hearing on Anderson's K.S.A. 60–1507 motion, which was conducted almost 6 years after his trial, the district court heard conflicting evidence about Proctor's various attempts to subsequently make it known that he had "'lied' " and wanted to " 'make it right.' "  In addition to his own testimony, Anderson presented testimony from an investigator, Proctor, and a friend of Proctor's.

The investigator testified that he worked with Anderson's K.S.A. 60–1507 counsel to find Proctor. Once he succeeded, he asked Proctor whether he told the truth or lied during Anderson's trial. Proctor replied, "'Yeah, I lied. I fabricated the truth and am willing to make it right.'" Proctor told the investigator that he was sick, that he was not sure how much longer he would live, and that "he wanted to get things right for his own peace of mind." Proctor also mentioned how he tried to tell this to the prosecutor in the summer of 2012, after he rode his bike from Portland to Olathe, but the prosecutor "'didn't want to listen.'"

Proctor's testimony at the evidentiary hearing largely mirrored what he told the investigator. Before he testified, the district judge confirmed that Proctor understood his right to counsel, his right not to self-incriminate, and the possibility that he could be prosecuted for perjury. Proctor indicated that he did and insisted that he wanted to testify rather than "submit to that as a bully tactic any longer."

During his direct examination, Proctor was able to recall many specifics, down to the number of the jail "pod" or area in which he got to know Anderson. When asked how he became involved in Anderson's case, Proctor replied that at the time, he was a "pretty much dying, addicted man" with "a poisonous line of thinking." Proctor did not deny that he and Anderson discussed "dealing with" A.W. However, Proctor insisted that he was responsible for "manipulating" those "vague little" conversations in order to create "plausible" information that he could then use to get out of jail. Proctor also insisted that he, not Anderson, wrote the note on the toilet paper. Once he learned that an expert had attributed the handwriting to Anderson, Proctor testified that he learned to mimic Anderson's handwriting. According to Proctor, he "definitely didn't know" at the time of trial "if [Anderson] was or wasn't guilty of a rape. [He] just knew that what [he] had done [by lying at the preliminary hearing] was incorrect and [he] didn't want to proceed." Proctor said he tried to relay this to the officers who came to take him from the prison to the courthouse and to the prosecutor before his trial testimony, but the prosecutor insisted on calling him to testify. When asked why he then testified at Anderson's trial as described above, Proctor explained that he "wasn't bold enough or courageous enough at that time to say that [he] had lied," because he "had allowed [himself] to absorb a fair amount of intimidation." Thus, he "used the language as a witness that maybe [he] didn't know when [he] was asked things"—a practice he later referred to as "a craftiness about being able to use vague language and get the point across."

As for his insistence at trial that he had not lied at the preliminary hearing, Proctor said the pressure from within the prison system stemming from "[r]atting on somebody" and his personal fears and cowardice precluded him from admitting at that time that he had lied. Proctor also denied that his tactic changed by the time of the trial because the court refused to follow the plea recommendation after Proctor had absconded following Anderson's preliminary hearing.

Proctor described the great lengths he went to once he was released from prison to apologize to Anderson and try to make amends. For example, he wrote several letters of apology to Anderson. Proctor explained:

"I thought I couldn't continue forward in life without coming back in life to make amends, to make something right. So I trained and planned and prepared for a bicycle ride from Portland to ... Olathe.

"In my mind I was going to visit the prosecution, and I felt kind of angry, so I imagined these different ways to play itself out. I would be strong enough to kind of flip off the prosecutor and tell him I wasn't going to be intimidated by that, carry that garbage, and if anything the man should have a new trial without me being a witness because I don't know anything about the rape. I know my participation was lies, false and erroneous, and I made it up in my mind."

According to Proctor, he made that bicycle trip from Oregon back to Olathe in October 2012 and explained to a detective and prosecutor during a meeting that lasted about 30 minutes how he was not truthful and had manipulated the information. Afterward, however, Proctor recalled being told he "had done a community service .... given handshakes and hugs and called 'a brother.'" He then "left ... thinking, 'Man, that did not go how I thought it was going to go.'" Proctor returned to Oregon, where he remained until he got the "gift" of being contacted by the investigator and "given an opportunity to rid [himself] of this poison and move forward."

Anderson testified about a conversation in which Proctor, who was helping Anderson with some research on a matter related to Anderson's leased truck but also had the police reports related to the rape charge, stated something to the extent of "'if this person isn't there, then they will dismiss stuff.'" Anderson responded that in that case they "'need[ed] to ... pray'" for his case. He admitted to writing portions of the toilet paper note but suggested not all of it was his and specifically denied otherwise talking to Proctor about, or offering him money to get rid of any witness.

In addition to cross-examining Anderson's witnesses, the State called the prosecutor, Chris McMullin to testify. McMullin recalled having a short surprise visit from Proctor a couple of years prior, which caught him off guard because the last time McMullin had seen Proctor "was in a hostile situation." McMullin did not recall Proctor saying he lied. However, had he done so McMullin would have followed his normal protocol of "remov[ing] [himself] from the situation" and getting a special investigator involved to take Proctor's statement, which did not happen. McMullin recalled that Proctor was there "just to say hi to [him]" and to tell him about "this journey he was on," which included going to college and heading out west but did not recall it involved a long bike ride. McMullin did not deny that at that point he told Proctor "that he had done the right thing by coming forth originally and testifying."

5

*The district court's decision*

At the close of the hearing, the district judge took the matter under advisement so she could further review the file and Proctor's criminal cases and asked the parties to submit proposed findings of fact and conclusions of law. Prior to resting, the judge commented on Proctor's extensive criminal history, which included crimes of dishonesty. The district court explained, "[T]hat isn't to say that he can't be truthful but his testimony does contradict Mr. McMullin's on some pretty important points," particularly with regard to what he said he told the prosecutor and a detective about how he "lied" and manipulated things to make Anderson look guilty. Given the judge's prior personal experience as both a prosecutor and defense counsel, she stated that she was more inclined to instead believe what McMullin said about his visit from Proctor "to be true." After those comments on credibility, the judge announced that she, nonetheless, wanted to review the pleadings, files, and transcripts "to make sure [she gave] this [her] full consideration." The parties thereafter submitted extensive findings and conclusions.

At a subsequent hearing in April 2014, the district judge orally pronounced her judgment denying Anderson's motion. In support, the judge explained that she had gone through the files and the parties' proposed findings to make sure she "gave it every consideration she could." The judge then summarily explained:

> "Mr. Anderson has asked for a new trial. That was based upon the grounds of newly discovered evidence. And while I think that the proffered evidence is newly proffered evidence, I do not believe that it rises to such materiality that would produce a different result on a new trial.
> "Mr. Proctor had a number of credibility issues to begin with. I do not believe what was produced here through the various witnesses would have caused a different result at trial."

After the court entered its written judgment that summarily found Anderson's K.S.A. 60–1507 "motion lacks merit," Anderson filed this timely appeal.

*Anderson v. State*, No. 111,889, 2015 WL 5224713, at *1–5 (Kan. App. Aug. 28, 2015)

(unpublished opinion), *rev. denied* (Kan. Apr. 21, 2016).

**Rule 4 Review of Petition**

Rule 4 of the Rules Governing § 2254 Cases requires the Court to review a habeas petition upon filing and to dismiss it "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." Rules Governing § 2254 Cases, Rule 4, 28 U.S.C.A. foll. § 2254.

**Petition**

Mr. Anderson bases his Petition on the same ground he pursued in his state habeas action. He describes it as "newly discovered evidence." Mr. Anderson states, "It is clear that [my] rights to have a fair trial was violated." He alleges, "The outcome of a new trial would be a different result" without Keith Proctor's testimony. ECF Doc. 1 at 6.

**Standard of review**

This matter is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under the AEDPA, a petitioner is entitled to habeas corpus relief only if the last reasoned state court decision either "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]", 28 U.S.C. § 2254(d)(1), or that decision was based upon an "unreasonable determination of the facts in light of the evidence presented." § 2254(d)(2). After making that showing, a petitioner under § 2254 must ultimately show that a constitutional violation occurred. *See Hancock v. Trammell*, 798 F.3d 1002, 1010 (10th Cir. 2015); 28 U.S.C. § 2254(a).

The AEDPA established a "highly deferential" standard of review and requires the habeas court to give "state-court decisions ... the benefit of the doubt." *Littlejohn v. Trammell,* 704 F.3d 817, 824 (10th Cir. 2013) (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002))(per curiam). In reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does not

sit as a super-state appellate court. *See Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard v. Boone,* 468 F.3d 665, 671 (10th Cir. 2006); *see also Frost v. Pryor,* 749 F.3d 1212, 1215 (10th Cir. 2014). This deferential standard of review "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice system, not a substitute for ordinary error correction through appeal." *Harrington v. Richter,* 562 U.S. 86, 102–03 (2011) (internal quotations and citations omitted).

The Court is required to presume the factual findings of the state court are correct unless Petitioner rebuts the presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *accord Welch v. Workman,* 639 F.3d 980, 991 (10th Cir. 2011).

**Analysis**

The Petition is subject to dismissal for two reasons. First, it was filed outside the limitation period established by the AEDPA. Second, Mr. Anderson has failed to demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

1. **Limitation period**

AEDPA established a one-year limitation period during which an inmate in state custody can file a federal habeas petition challenging a state conviction. 28 U.S.C. § 2244(d)(1). The act provides four alternative starting dates for the limitation period:

The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* § 2244(d)(1)(A)-(D). The statute includes a tolling provision for properly filed post-conviction actions:

> The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

*Id.* § 2244(d)(2).

In this case, the latest date for determining the start of the limitations period is determined under paragraph (A). Under Paragraph (D), the factual predicate of the claim that Mr. Proctor lied at trial could have been discovered by Petitioner when he testified. See Taylor v. Martin, 757 F.3d 1122, 1123-24 (10th Cir. 2014). Petitioner discovered that Mr. Proctor was recanting his testimony on December 19, 2009, when he received a card from Mr. Proctor apologizing for lying. Both of these events occurred long before Petitioner's judgment became final.

The Supreme Court has held that "[f]inal judgment in a criminal case means sentence. The sentence is the judgment." *Burton v. Stewart*, 549 U.S. 147, 156 (2007), quoting *Berman v. United States*, 302 U.S. 211, 212 (1937). A case on remand for resentencing is not final "for purposes of habeas proceedings arising from state court convictions until the resentencing and the direct appeal thereof [are] complete." *Najera v. Murphy*, 462 F. App'x 827, 829 (10th Cir. 2012), quoting *United*

*States v. Carbajal-Moreno*, 332 F. App'x 472, 475 (10th Cir. 2009). Petitioner was resentenced on October 12, 2010. Petitioner's conviction became final on October 26, 2010, at the conclusion of the 14-day period available for him to appeal the resentencing judgment. Since Petitioner did not file a direct appeal of this final judgment in state court, he does not receive the 90-day period to file a petition for certiorari in the United States Supreme Court. *See Najera*, 462 F. App'x at 830. Therefore, Petitioner's AEDPA statute of limitations began to run on Tuesday, October 26, 2010.

However, AEDPA allows for tolling of the limitation period while a properly filed state post-conviction action is pending before the state courts. *See* 28 U.S.C. § 2244(d)(2). Therefore, the one-year period started to run on October 26, 2010, and ran until April 4, 2011, when Petitioner filed his state habeas corpus motion, using up 160 days of the limitation period.

The tolling continued while Mr. Anderson's state habeas corpus litigation continued. Tolling ended when the Kansas Supreme Court denied his petition for review on April 21, 2016. He does not receive an additional 90 days when he could have filed for certiorari to the U.S. Supreme Court. *See Najera*, 462 F. App'x at 831, citing *Rhine v. Boone*, 182 F.3d 1153, 1155 (10th Cir. 1999). Having only 205 of his available 365 days remaining, Petitioner needed to file this §2254 petition by November 12, 2016. Instead, he filed this action on April 19, 2017. His petition is untimely.

Petitioner makes three arguments to attempt to refute the proposition that his habeas petition was untimely filed. First, Petitioner argues he was not informed of the possibility of filing a federal habeas petition by any of his defense attorneys or by the state courts. "[I]gnorance of the law, even for an incarcerated pro se petitioner, generally does not excuse prompt filing." *Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000) (citation omitted).

Next, Petitioner argues he had one year to file this action after the Kansas Supreme Court rejected his 60-1507 petition. There is no support for this construction of AEDPA's doctrine regarding the finality of a conviction.

Last, Petitioner argues he should be entitled to the application of equitable tolling. Under very limited circumstances, the limitation period may be equitably tolled. *See Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). "[A] [habeas] petitioner is entitled to equitable tolling if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010). "[A]n inmate bears a strong burden to show specific facts to support his claim of extraordinary circumstances and due diligence." *Yang v. Archuleta*, 525 F.3d 925, 928 (10th Cir. 2008). Here, Petitioner had been pursuing his claim diligently, but then inexplicably waited almost exactly a year after the Kansas Supreme Court rejected his 60-1507 petition to file in this Court. He alleges no extraordinary circumstance, beyond the circumstances experienced by most incarcerated pro se litigants. Given that "[e]quitable tolling is a rare remedy to be applied in unusual circumstances" (*Wallace v. Kato*, 549 U.S. 384, 396 (2007)), the Court declines to apply it in this case.

### 2. Lack of constitutional violation

Even if Petitioner's habeas action was not time-barred, he has not demonstrated that the state court adjudication of his claim was objectively unreasonable or that it resulted in a constitutional violation. Mr. Anderson's entire petition is based on Mr. Proctor recanting his testimony. However, a witness's recantation, even if truthful, does not warrant habeas relief absent evidence indicating the prosecutor knew that the witness's testimony was false at the time the witness testified. *Romano v. Gibson,* 239 F.3d 1156, 1175 (10th Cir. 2001). Where the prosecutor

knows the witness's testimony was false, the testimony is material, and the prosecutor fails to disclose that knowledge to the defendant, the defendant's right to due process is violated. *See United States v. Caballero,* 277 F.3d 1235, 1243–44 (10th Cir. 2002). In this case, Petitioner has not alleged a due process violation because he lacks any credible facts to establish that the prosecutor knew Mr. Proctor's testimony was false. In fact, he does not even make that claim. Certainly, then, it cannot be said that the determination of the Kansas Court of Appeals and Supreme Court that he is not entitled to relief on the grounds of Mr. Proctor's recantation was an unreasonable application of Supreme Court precedent.

Furthermore, Petitioner has failed to establish by clear and convincing evidence that the Kansas courts made an unreasonable determination of the facts in light of the evidence presented at the evidentiary hearing. Out of an abundance of caution, the Court acknowledges that the Tenth Circuit has recognized that the Supreme Court has not necessarily foreclosed the possibility that a truly persuasive demonstration of actual innocence might warrant habeas relief. *Clayton v. Gibson,* 199 F.3d 1162, 1180 (10th Cir. 1999). Mr. Proctor's recantation fails to rise to the level of being a truly persuasive demonstration of actual innocence.

In sum, then, this Court cannot say that the Kansas Court of Appeals unreasonably applied Supreme Court precedent or made an unreasonable determination of the facts with respect to Mr. Proctor's recantation. Accordingly, Mr. Anderson is not entitled to habeas relief on this basis.

**Certificate of Appealability**

Finally, the Court must consider whether to issue a certificate of appealability. Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." The Court may issue a certificate of appealability "only if the applicant has made

a substantial showing of the denial of a constitutional right," and the Court "indicates which specific issue or issues satisfy [that] showing." 28 U.S.C. § 2253. A petitioner meets that standard by showing that the issues presented are debatable among jurists, that a court could resolve the issues differently, or that the issues deserve further consideration. *Slack v. McDaniel,* 529 U.S. 473, 483-84 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 (1983)).

The Court concludes that Petitioner has not made a substantial showing of the denial of a constitutional right and therefor declines to enter a certificate of appealability.

**IT IS THEREFORE ORDERED** that Gregory Allen Anderson's Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody (ECF Doc. 1) is denied.

**IT IS SO ORDERED.**

DATED: This 2nd day of October, 2018, at Topeka, Kansas.

        **s/ Sam A. Crow**
        **SAM A. CROW**
        **U.S. Senior District Judge**